***********
This matter was reviewed by the Full Commission based upon the record of the proceedings before Deputy Commissioner Stanback, along with the briefs and arguments on appeal. Accordingly, the Full Commission AFFIRMS in part and MODIFIES in part the Deputy Commissioner's holding and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission, and the Industrial Commission has jurisdiction of the parties and the subject matter.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. This case is subject to the North Carolina Workers Compensation Act.
4. An employment relationship existed between the plaintiff and Defendant/Employer on March 28, 2002.
5. Plaintiff's average weekly wage is $633.11
6. Plaintiff seeks temporary total disability from May 31, 2002 through the present.
7. Document stipulated into evidence include the following:
Stipulated Exhibit #1 — Plaintiff's medical records.
 ***********
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. Plaintiff was born January 2, 1966 and was 37 years old at the time of the hearing before the Deputy Commissioner. Plaintiff has a ninth grade education.
2. Plaintiff had been employed as a driller with the defendant-employer for twelve years at the time of his report of injury. Defendant-employer's business is drilling and blasting rock with dynamite.
3. Plaintiff's job duties included drilling, which involves the constant moving of levers to run a mechanical drill. Moving these levers would sometimes require a fair amount of force. The crew may drill up to 100 holes per day. Plaintiff would also be required to drill with a percussion drill much like a jackhammer. As part of his job duties, the plaintiff also "loaded holes." Loading holes involves carrying gravel in five gallon buckets, pouring the gravel into the holes, and then tapping the gravel down with a pole. The plaintiff also had to carry dynamite. Carrying dynamite involves carrying 55 to 60 pound boxes of dynamite over 20 to 100 feet. More duties included "snapping caps" and shoveling gravel. Snapping caps requires hooking blasting caps onto the detonating wire and the dynamite. Shoveling gravel involves shoveling gravel into the holes. Plaintiff would also have to pole holes to see how deep they were. At least half of the time poling was done in mud, requiring exertion and strenuous grasping of the pole. Plaintiff then would push dynamite into the holes. Pushing dynamite into the holes with a pole involves the same type of work as poling the holes. Then plaintiff would be required to pour "ampho" into the holes, which is a fertilizer-like substance that comes in 50-pound bags. Plaintiff was required to carry the bags and then pour the material into the holes. This would ordinarily be done after all the holes were drilled. He would measure the ampho by moving a pole up and down constantly while it is being poured. He would also be required to open up boxes to lay out caps. Plaintiff had to change steel on the drill bits as required. These bits were 80 to 100 pound lengths of steel that had to be changed or added to the drill to drill deeper into the rock. Plaintiff would manually unscrew a bit from the drill and then add another, longer bit. He would unscrew broken bits from the drill and replace them with new bits. Plaintiff also twisted up cones, which involves cutting roofing paper and then rolling it into a cone shape and plugging the holes with it to prevent moisture. He also marked the holes using a measuring stick and spray paint.
4. The plaintiff reported symptoms of "right arm pain, thumb, hand and all the way up" to Roxboro Internal Medicine Pediatrics on March 28, 2002. Dr. McDaniels found positive Phalen's and positive Tinel's signs, and diagnosed bilateral carpal tunnel syndrome. He referred the plaintiff to Dr. Peter Bronec, neurosurgeon. Plaintiff had begun experiencing numbness and pain in his upper extremities as early as November, 2001.
5. Plaintiff underwent nerve conduction studies and EMGs on May 9, 2002 with Dr. Ugo Goetzl, a neurologist. The results of these tests confirmed Dr. Bronec's diagnosis of bilateral carpal tunnel syndrome.
6. Plaintiff also underwent a cervical MRI on April 19, 2002, but Dr. Bronec interpreted the results of the MRI as showing no significant nerve compression.
7. Dennis Carver worked for the defendant-employer in 1995 while in high school, and then again for approximately two years from 1995 — 1997 after graduating from high school. Mr. Carver saw the plaintiff doing everything on the job, including shoveling everyday. While running the hand drill himself, Mr. Carver's hands would become numb. According to Mr. Carver, the defendant-employer used buckets for carrying gravel when he worked for the defendant-employer as early as 1995, and the workers would need buckets and gravel on a job nine times out of ten.
8. B.J. Wilson worked for the defendant-employer on two separate occasions, for approximately three and one half years on the first occasion; he left for approximately one year, and then returned to the defendant-employer. He saw the plaintiff using the big drills and the hand drill. He witnessed the plaintiff doing all of the above-mentioned job duties for the defendant-employer.
9. At the time of the hearing, Michael Thaxton worked for Mainline Contracting and had known the plaintiff for a few years. Mr. Thaxton also previously worked for the defendant-employer while the plaintiff was employed there. He has seen the plaintiff running the hand drill and the big drills. He had also seen plaintiff carrying buckets of gravel to fill in the holes. Buckets of gravel filled with "57 stone" would weigh approximately 50 — 60 pounds. Mr. Thaxton had seen the plaintiff using the hand drill as recently as a few months prior to the hearing at a job site off of Martin Luther King Boulevard in Durham.
10. Richard Wilbourne also worked for Mainline Contracting. Mr. Wilbourne witnessed the plaintiff running the big drills and the hand drill. Mr. Wilbourne has had the same surgeries as the plaintiff as a result of manipulating levers on his backhoe and excavator at his employment. Mr. Wilbourne had also seen the plaintiff working for the defendant-employer within a few months of the hearing.
11. C.R. Wilbar, a defense witness, had seen the plaintiff running the hand drill. He also knew of at least 20 — 25 jobs on which the defendant-employer had utilized the hand drill in the last five years. Mr. Wilbar confirmed that the plaintiff helped with all the work duties on the job sites.
12. Plaintiff underwent right carpal tunnel release with Dr. Peter Bronec on June 5, 2002, and a left carpal tunnel release with Dr. Peter Bronec on July 5, 2002.
13. Dr. Bronec found the plaintiff's hands to be severely calloused. He also found marked thickening of the ligament with marked compression of the underlying nerve. Dr. Bronec allowed the plaintiff to attempt to return to work on August 19, 2002 with restrictions of no repetitive flexion, no extension of the wrist, avoid strenuous grasping, and directions to avoid constant or repetitive vibration. The defendant-employer would not allow the plaintiff to return to work within the restrictions assigned, and asked the plaintiff to return to the doctor to obtain more specific restrictions.
14. Dr. Bronec stated in his medical note dated August 27, 2002 that the plaintiff should be able to mark holes, twist up cones, and open boxes and lay out caps. However, he should be using a cutting tool if necessary to open the box. Plaintiff was allowed to do some limited shoveling of gravel and limited snapping of caps. He might be able to carry and pour gravel, but no more than two gallons at a time. Dr. Bronec anticipated that the plaintiff would start with these tasks, and then possibly be able to do some limited poling of holes if plaintiff tolerated the other tasks. These restrictions were further written in a note for the defendant-employer dated August 28, 2002. In spite of this limited return to work note, the defendant-employer would not allow the plaintiff to return to work.
15. Dr. Bronec rated the plaintiff as suffering from a 10% permanent partial disability to each hand on January 16, 2003. The rating was due to the severe case of bilateral carpal tunnel syndrome from which the plaintiff suffered. Plaintiff last treated with Dr. Bronec in July 15, 2003, when Dr. Bronec released plaintiff from his care.
16. The defendants offered Jason Jackson as an expert in ergonomics. Mr. Jackson is not a certified ergonomist. Furthermore, Mr. Jackson at least partially based his opinions on misinformation provided by the defendant-employer, namely Gregg Shonyo. Mr. Jackson spent 45 — 60 minutes on a job site of the defendant-employer, but he never spoke with the plaintiff. Mr. Jackson also could not name the other employees he spoke with or how long he talked with them.
17. In the conversations he had with different persons, Mr. Jackson was never told about the old drilling machine that the plaintiff operated when he was first with the company, nor was he told about bits breaking, or lengths of steel breaking. Mr. Jackson did not know about the difference between drill bits or drill lengths. He also could not remember how far down Gregg Shonyo drilled when he illustrated the large drilling machine, and he was never shown the operation of the small drill.
18. During his visit on-site, Mr. Jackson did not inquire about when the workers obtained buckets to carry gravel to the holes, and he did not include operating the jackhammer in the summary of ergonomic risk factors in his report. He was never told how many holes the company might drill in one day, and he admitted that changing a 14-foot drill length would require working above shoulder level, even though his report reflected otherwise. Furthermore, Mr. Jackson is not medically trained.
19. The Full Commission accepts Mr. Jackson as an expert in ergonomics, but his conclusions and report are afforded little weight.
20. The undersigned assigns greater weight to the testimony of the plaintiff and plaintiff's co-workers as indicated herein, due to their actual work in the drilling industry and their superior knowledge of the processes and job duties required as compared to Mr. Jackson.
21. The plaintiff independently performed automotive mechanic work on a part-time basis; however, there is insufficient evidence in the record to suggest that duties associated with his auto mechanic work contributed in any significant way to the plaintiff's development of bilateral carpal tunnel syndrome.
22. Dr. Bronec testified that plaintiff was put at an increased risk of contracting bilateral carpal tunnel syndrome as compared to the general public not so employed and also testified that plaintiff's job duties significantly contributed to his development of bilateral carpal tunnel syndrome.
22. The plaintiff's job duties and his tenure of employment with the defendant-employer placed him at an increased risk of developing bilateral carpal tunnel syndrome compared to other members of the general public not similarly employed. Plaintiff's job duties and tenure of employment with the defendant-employer significantly contributed to his development of bilateral carpal tunnel syndrome.
23. Defense counsel sent a letter and the ergonomic report of Jason Jackson to Dr. Peter Bronec on July 2, 2003, copying plaintiff's counsel, but without the consent of plaintiff or plaintiff's counsel, in violation of Terry v. PPG Industries, Inc., 156 N.C. App. 512 (2003) andSalaam v. N.C. Dept of Transportation, 345 N.C. 494, 480 S.E. 2d 51
(1997). As such, all portions of Dr. Bronec's testimony answering questions related to the report are stricken from the record.
24. Defendant-employer effectively terminated plaintiff from employment on May 30, 2002 when they sent company employees to pick up plaintiff's company truck.
25. As a result of his compensable occupational disease of bilateral carpal tunnel syndrome, plaintiff was temporarily totally disabled from May 31, 2002, through July 15, 2003, when he was released by Dr. Bronec; however, there is insufficient evidence in the record upon which to determine whether plaintiff continued to be temporarily totally disabled beyond that date. The medical evidence of record is absent any documentation of plaintiff's condition beyond his last treatment with Dr. Bronec on July 15, 2003. Thus, in finding that plaintiff was temporarily totally disabled from May 31, 2002, through July 15, 2003, the Full Commission deems it appropriate to remand this matter to a deputy commissioner for the taking of additional evidence or further hearing, if necessary, and the entry of an Opinion and Award with findings on the issue of the extent of plaintiff's disability, if any, for the period following July 15, 2003.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff developed the occupational disease of bilateral carpal tunnel syndrome as a direct result of his employment with defendant-employer. His position and the job duties associated therewith placed him at an increased risk of developing bilateral carpal tunnel syndrome when compared to the general public not so employed. His position and the job duties associated therewith also significantly contributed to his development of bilateral carpal tunnel syndrome. Plaintiff is entitled to receive workers' compensation benefits as a result of his occupational disease. N.C. Gen. Stat. § 97-53(13).
2. Plaintiff is entitled to receive temporary total disability benefits at the compensation rate of $422.09 per week from May 31, 2002, through July 15, 2003, the date he was released by Dr. Bronec. N.C. Gen. Stat. §97-29.
3. Plaintiff is entitled to receive medical benefits for so long as they continue to effect a cure, give relief, and/or lessen the plaintiff's period of disability, subject to N.C. Gen. Stat. § 97-25.1.
4. Defense counsel sent a letter and the ergonomic report of Jason Jackson to Dr. Peter Bronec on July 2, 2003, copying plaintiff's counsel, but without the consent of plaintiff or plaintiff's counsel. As such, all portions of Dr. Bronec's testimony answering questions related to the report are stricken from the record. Terry v. PPG Industries,Inc., 156 N.C. App. 512 (2003). Salaam v. N.C. Dept of Transportation,345 N.C. 494, 480 S.E. 2d 51 (1997).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to attorney's fees as approved herein, defendants shall pay to plaintiff temporary total disability compensation at the rate of $422.09 per week from May 31, 2002, through July 15, 2003, the date he was released by Dr. Bronec. All compensation that has accrued shall be paid in one lump sum, subject to the attorney's fees approved herein.
2. Defendants shall pay for all medical expenses incurred or to be incurred by plaintiff as a result of his compensable occupational disease for so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiff's period of disability.
3. A reasonable attorney's fee of twenty five percent (25%) of the compensation due plaintiff under Paragraph 1 of this AWARD is hereby approved for plaintiff's counsel and shall be paid as follows: twenty five percent (25%) of the compensation due plaintiff shall be deducted from said compensation and paid directly to plaintiff's counsel. All compensation that has accrued shall be paid in one lump sum. Thereafter, defendants shall pay to plaintiff's counsel every fourth check due the plaintiff.
4. Defendants shall pay the costs.
 ***********
In addition to the Award provided herein, the Full Commission enters the following:
 ORDER
This matter is hereby REMANDED to Chief Deputy Commissioner Stephen T. Gheen for assignment to a deputy commissioner for the taking of additional evidence or further hearing, if necessary, and the entry of an Opinion and Award with findings on the issue of the extent of plaintiff's disability, if any, for the period following July 15, 2003.
This 15th day of July 2005.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER